# CHARLESTON.

### DONNALLY v. HEARNDON et al.

Submitted September 12, 1895.—Decided Dec. 7, 1895.

1. CORPORATIONS—ASSETS OF DEFUNCT CORPORATIONS.

After a corporation shall expire, or be dissolved, its assets remain subject to the payment of its liabilities, and suits may be brought against such corporation to enforce its liabilities. See Code (Ed. 1891) p. 511, c. 53, s. 59.

2. CORPORATIONS—LIABILITY OF NEW CORPORATION.

When a new corporation, with different stockholders, is formed, it can not be sued by the creditors, or be held liable for the debts of the old corporation, except upon some special ground, such as having received assets of the old corporation without giving value therefor.

3. STOCKS—RIGHTS OF PLEDGEE—PLEDGOR'S CREDITORS.

A stockholder of one bank, by written assignment, transfers his stock to another bank as collateral security for his indebtedness or liability, of any or every kind, present or future; giving such bank the right at any time of collection, to determine to which debt or liability it will apply the same. Such right of application of the collections on, or proceeds of the sale of, such pledge or collateral, exercised in good faith, can not be interfered with or contested by the creditors of the debtor to the detriment of the pledgee.

4. STOCKS—SALE OR PLEDGE OF STOCKS.

If any person, for valuable consideration, sell, pledge, or otherwise dispose of any shares of stock belonging to him, to another, and deliver to him the certificate for such shares, with power of attorney authorizing the transfer of the same on the books of the corporation, the title of the former shall vest in the latter, so far as may be necessary to effect the sale, pledge, or other disposal of the said share, not only as between the parties themselves, but also as against the creditors of, and subsequent purchasers from, the former. Code, c. 53, s. 37.

5. STOCKS—CORPORATION—STOCKHOLDER.

But the person in whose name shares of stock stand on the books of the corporation shall be deemed the owner thereof, so far as the corporation is concerned. Code, c. 53, s. 19.

6. CORPORATIONS—NOTICE OF STOCK TRANSFERS.

In order to bind the bank whose stock is thus pledged as collateral, notice should be given its president, cashier, or other officer at its place of business, and in the usual course of business.

7. CORPORATIONS—DIVIDENDS—STOCKHOLDER'S INDEBTEDNESS.

The board of directors may from time to time declare dividends of so much of the net profits as they may deem it prudent to divide. If any stockholder be indebted to the corporation, his dividend, or so much thereof as may be necessary, may be applied to the payment of the debt, if the same be then due and payable. Code (Ed. 1891) p. 507, c. 53, s. 39.

A case in which these rules are discussed and applied.

SIMMS & ENSLOW for appellant, cited Code, c. 53, ss. 19' 39; Cook, Stock and Stockholders, §§ 525, 526, 538; 76 Md. 546; 79 Cal. 323; 6 Leigh, 433; Mor. Priv. Corporations §§ 540, 812.

KENNEDY & DYER for appellee cited 2 Brandt, Sur. § 298 et seq.; Bisp. Eq. § 335 et seq.; 3 Leigh, 272; 75 Va. 407; 76 Va. 392; 26 W. Va. 742; 51 Vt. 320; 44 Vt. 601; Colebrooke, Col. Sec. 271-275; Bisp. Eq. 390, 397; 57 Iowa, 326; 1 Brandt, Sur. §§ 440, 442; Colebrooke, Col. Sec. 268, 308, 310, 365, §§ 243, 280, 294; 15 N. H. 119; 27 W. Va. 660; Cook, Stock and Stockholders, §§ 538, 539, 468, notes; Colebrooke, Col. Sec. 344, and authorities cited.

HOLT, PRESIDENT:

On appeal from a decree of the Circuit Court of Kanawha county entered on the 11th day of May, 1895, for the sale of certain bank stock of defendant R. Hearndon, which he had

pledged as collateral security to the Kanawha Valley Bank.

The defendant R. T. Hearndon was on the 21st day of June, 1889, the owner of ten shares (of $100) of the stock of the Bank of Huntington, being certificate of stock No. 28. By writing of that date, defendant Hearndon assigned, transferred, and delivered this certificate of stock to the Kanawha Valley Bank as collateral security for any indebtedness of his to the bank then existing, or that might thereafter be created, however evidenced or created, or of whatever character or form. And the bank was to have the right, in applying the proceeds of this stock thus pledged as collateral at the time of any collection, to determine to which debt or liability it would apply the same, if more than one debt or liability should then exist.

The Kanawha Valley Bank elected to hold the stock (1) to pay a balance on a note of Hearndon of five thousand two hundred dollars. This balance, which remained after sale under deed of trust to secure the note, amounted on the 11th day of May, 1895, to the sum of nine hundred and thirty five dollars and forty cents. (2) The note for Hearndon indorsed by Dyer for five hundred dollars. Thus far there is no controversy. But in the third and last place, the bank elected to hold this stock for the payment of the Hearndon note of two thousand dollars, indorsed by J. H. Russell. To this third application the plaintiff, Donnally, objected. Donnally, for the accommodation of Hearndon, had indorsed three notes—one for five hundred dollars, dated 23d March, 1892, at four months; one for six hundred dollars, dated May 12, 1892; and one for six hundred dollars, dated 26th October, 1891, at four months; and plaintiff and defendant C. E. Champe had indorsed for Hearndon a note for five hundred dollars, dated January 18, 1892, at four months. Each of these notes was renewed from time to time until 1st April, 1893, 27th May, 1893, and 11th April, 1893, and 27th January, 1893. At their maturity, Donnally paid these notes indorsed by himself, and he and Champe equally paid the one indorsed by them; and he claims the right to be subrogated, to the extent of such payments, to the rights of the Kanawha Valley Bank, as against this stock transferred as such pledge.

In May and in July, 1894, plaintiff, Donnally, filed his bill and amended bill in the circuit court of Kanawha county against Hearndon, the Kanawha Valley Bank, the Bank of Huntington, the Huntington National Bank, W. T. Thompson, C. E. Champe, M. H. Dyer, John Hooe Russell, as an individual, and as president of the Huntington Bank, and J. Q. Dickinson, as president, and R. T. Oney, as cashier, of the Kanawha Valley Bank, setting forth the above facts, among others; praying that he may be substituted to all the rights of the Kanawha Valley Bank in reference to said stock taken as collateral security, and to the dividends thereon; that this stock may be turned into money, *etc.*, and applied in payment of his claim, or, if it has been improperly disposed of, that he may have a personal decree for the amount against the Kanawha Valley Bank, and for general relief. All the defendant filed answers.

The Kanawha Valley Bank answered, filing its contract of assignment of this stock as collateral; giving its reason for holding the stock as security for the balance on the note secured by deed of trust, and for the Dyer note, which need not be gone into, as its right to so hold and apply to these two debts is not controverted by any one. It also claims the right to apply the excess, if any, to the note for two thousand dollars of Hearndon indorsed by Russell. The Kanawha Valley Bank further says that it did not take this stock for its dividends; did not know that there were any until in December, 1893, at which time it demanded payment thereof of the Bank of Huntington, and the same was not paid; that it has never received any dividends or anything on account of the stock, nor been guilty of any misapplication or negligence, *etc.*; and denies that plaintiff has any right of substitution, or any relief as against the collateral, or against the bank in relation thereto.

Defendant Hearndon answered that the note for two thousand dollars made by him, and indorsed by defendant Russell, was discounted by the Kanawha Valley Bank, and the proceeds were applied to and for the joint use and benefit of himself and Russell, in buying certain stock—one thousand dollars for himself, and one thousand for Russell;

that the transactions between them are unsettled, but that he is entitled to a credit of eight hundred and thirty three dollars and thirty three cents, should Russell pay his (Hearndon's) half of the note.

On the 1st day of January, 1894; the Bank of Huntington was consolidated with the Commercial National Bank, and formed the Huntington National Bank. On that day the Huntington Bank ceased to exist as a bank, and by order of the stockholders and directors, James K. Oney and F. B. Enslow were appointed trustees to wind up the business of the banking corporation thus dissolved, and its unsettled business was placed in their hands for that purpose, and the business of the two consolidated banks, as banks, is now carried on by the Huntington National Bank, at Huntington, W. Va., as their successor, and as such it has, and is entitled to all of the assets, except those left in the hands of the trustees for settlement. The Huntington National Bank and these two trustees file their answer, and say that by virtue of the agreement by which the Huntington National Bank was created, the owner of each share of stock in the Bank of Huntington is entitled to two shares in the Huntington National Bank, without further payment, and the holder of said certificate No. 28, of one thousand dollars, is entitled to receive twenty shares of stock, of one hundred dollars per share, in the Huntington National Bank, of the value of about two thousand three hundred dollars; that the fact that Hearndon had deposited his certificate of stock as collateral in the Kanawha Valley Bank in 1889, and the terms and condition of such deposit, were not known to the officers and directors of the Bank of Huntington until December 19, 1893, and the bank itself had ceased to exist before the transfer and assignment thereof; that J. H. Russell was president, and J. K. Oney cashier, of the Bank of Huntington, and they are, respectively, president and cashier of the Huntington National Bank; that defendant Hearndon owed the Bank of Huntington; that said ten shares stood in his name, as owner, on the books of the bank, and that prior to December 19, 1893, the bank, by its officers, knew of no other owner or claimant; that before that time, *viz.* on February 1, 1893, and December 4, 1893, divi-

dends (one of two hundred and forty dollars, and one of one thousand dollars) were declared and paid to Hearndon, on his stock, and the same, to the extent of one thousand dollars, used in paying what he then owed the Bank of Huntington, and the residue, *viz.* two hundred and forty dollars, paid out on his check, and that up to that time the bank and its managing officers had no notice that any one else claimed or was entitled to dividends; that one hundred and sixty dollars, dividends declared since December 19, 1893, stand to the credit of Hearndon on the books of the Huntington National Bank. And they deny that the Kanawha Valley Bank is entitled to any dividends at all until the stock is regularly transferred on the books of the bank; and claim it is entitled to nothing but the stock. The Huntington National Bank, answering, says that it was not in existence until January 1, 1894, after these transactions had taken place; is not chargeable with any dividends except the one hundred and sixty dollars, which it is ready to pay to the one entitled, and also ready to issue the two thousand dollars in lieu of certificate No. 28.

John Hooe Russell filed his answer as an individual, and as president of the Bank of Huntington. For his answer as president of the bank, he adopts the answer of the Huntington National Bank; and, as an individual, he says that in April, 1891, he indorsed for defendant Hearndon a note for two thousand dollars, payable and discounted by the Kanawha Valley Bank; that it was an accommodation indorsement, and the money obtained went to the individual credit of Hearndon; and that he does not owe the note, otherwise than as indorser, and received none of the money or the benefit of any part thereof.

James K. Oney adopts the answer of the trustees of the Bank of Huntington, and the answer of the Huntington National Bank.

W. T. Thompson filed his answer, setting up that Hearndon, being indebted to him more than fifteen thousand dollars on the 29th day of May, 1892, in order partially to secure him, assigned and transferred to him the ten shares of stock owned by Hearndon in the Bank of Huntington, of which transfer the Bank of Huntington had notice, and

that he is entitled to the two thousand dollars exchange stock to be issued therefor by the Huntington National Bank, and is entitled to the dividends, amounting on December 30, 1893, to one thousand and four hundred dollars, and dividends since declared; that this stock was deposited with the Kanawha Valley Bank, not as security for the indorsers of Hearndon, but as security to the bank for individual loans made to him by the bank, and not to secure any notes with indorsers; and he prays that the stock may be delivered to him.

Some depositions were taken, and on the 11th day of May, 1895, the decree complained of was entered, which decreed a sale of the stock, and that the proceeds of said sale after payment of costs of suit, should be applied to pay first to the Kanawha Valley Bank the amount of the indebtedness of said Herndon to said bank, as therein set forth.

The court gave plaintiff, Donnally, a decree against defendant Hearndon for two thousand, one hundred and sixteen dollars and ninety three cents, with interest from date until paid; to Champe, a decree against Hearndon for two hundred and thirty seven dollars and eighty one cents; to the Kanawha Valley Bank, a decree against R. T. Hearndon and J. Hooe Russell for two thousand, two hundred and eighty dollars and fifty cents; to the Kanawha Valley Bank, a decree against the Huntington National Bank, successor to the Bank of Huntington, for the sum of one thousand, three hundred and fifty eight dollars and ninety six cents, with interest from the date of the decree till paid.

This decree against the Huntington National Bank is erroneous, for two reasons: (1) There is nothing to show that the Huntington National Bank agreed or assumed to pay the liabilities of the Bank of Huntington, nor is anything alleged from which such obligation can be implied. The one was a state bank which has surrendered its charter. The one decreed against is a national bank which only came into existence on the 1st day of January, 1894, after these transactions of receiving the first dividends had taken place. It did not receive the assets of the old bank, nor do the stockholders appear to be the same. Therefore, whatever right they may have against the Bank of Huntington, by reason of the dividends on this stock, it gives

them no right to rank as creditors of the national bank. See 2 Mor. Priv. Corp. § 811. Upon the dissolution of the Bank of Huntington, the rights of its creditors became fixed. They were entitled to have the assets of the bank sold, and the proceeds applied in payment of their claims, and, to that end, to have the trustees or a receiver appointed, if necessary; for a court of equity, which never allows a trust to fail for the want of a trustee, would see to the execution of the trust, although by the dissolution of the corporation the legal title to its property may have been changed. See 5 Thomp. Corp. § 6585. But (2) the Bank of Huntington has itself appointed such trustees, and they are before the court as parties defendant; and the decree, if any, should have been against them, so far as they have assets, or against the old bank, which continues to exist for the purpose of winding up its affairs, and to that end may sue or be sued. There should certainly have been no decree against the new bank, according to the facts as they appear by this record. See Code, p. 511, c. 53, ss. 57, 59, as to the effect of the dissolution of a corporation, and the winding up of its affairs.

But (3) should there have been any such decree at all? Code (Ed. 1891) p. 506, c. 53, s. 37, provides that, "If any person for a valuable consideration, sell, pledge or otherwise dispose of any shares belonging to him, to another and deliver to him the certificate for such shares, with a power of attorney authorizing the transfer of the same on the books of the corporation, the title of the former shall vest in the latter so far as may be necessary to effect the sale, pledge or other disposal of the said shares, not only as between the parties themselves, but also as against the creditors of and subsequent purchasers from the former, but subject nevertheless to the provisions contained in the 19th section of this chapter." And the nineteenth section of chapter 53 of the Code reads as follows: "The person in whose name shares of stock stand on the books of the corporation, shall be deemed the owner thereof so far as the corporation is concerned. The board may from time to time declare dividends of so much of the net profits as they deem it prudent to divide. If any stockholder be indebted

to the corporation his dividend, or so much thereof as may be necessary may be applied to the payment of the debt if the same be then due and payable." Code, p. 507, c. 53, s. 39. This stock still stood on the books of the Bank of Huntington, in the name of R. T. Hearndon, on the first day of February, 1893, when the dividend of two hundred and forty dollars was declared, and on the 4th day of December, 1893, when the dividend of one thousand dollars was declared; and his indebtedness to the bank of that amount, then due and payable, was set off against the dividend, or the dividend was, under the statute, applied in payment of the debt then due and payable to the bank, and the two hundred and forty dollars was paid out on Hearndon's check. No notice—at least, no formal notice—had then been given to the Bank of Huntington by the Kanawha Valley Bank that it held as collateral the Hearndon stock. Such formal notice was not given until the 19th day of December, 1893. The manifest purpose of the statute is to permit the corporation to go by its books, in ascertaining who is the owner of stock, and not require it to go out on the street and hunt them up; and, without such statute, it is a well settled rule that the corporation is protected in paying dividends to a recorded shareholder, although he may have transferred his shares, no notice of transfer having been given the company. 1 Cook, Stock, Stockh. & Corp. Law (3d Ed.) § 538. What was the character of the notice, and the status of the ownership of this stock prior to the 19th day of December, 1893 ? At the time the stock was deposited as collateral with the Kanawha Valley Bank, on the 21st day of June, 1889, the Huntington National Bank (the one decreed against) was not in existence. The fact of such deposit was known to John Hooe Russell, president of the Huntington Bank, yet the terms and conditions of such deposit were not known to the Bank of Huntington, through any of its officers or directors, until the 19th day December, 1893; prior to that time R. T. Hearndon, in whose name the ten shares of the capital stock in question stood, claimed to control and own the same, and so far as the books of the bank showed, and so far as the bank

and its officers knew, he had a right to receive, and did receive, all dividends accruing on account of his holding of stock, no one else having before that time claimed the dividends. Col. Dickinson, president of the Kanawha Valley Bank, in the latter part of the year 1893, talked with Mr. Russell, the president, about the Hearndon debt of two thousand dollars, of which he was indorser, "and I think he understood at that time that we held the collateral." He does not say when this was, but Russell says it was before the 19th December, 1893; and I infer that such notice, when given and where given, was at a time and place when Russell was totally dissociated from his official duties, and was receiving information as to his own private affairs. See 4 Thomp. Corp. §§ 4617 *et seq.* 5228.   Evidently one of the objects of our statute cited above was to free banks and other corporations from the danger of such loose and unreliable evidence of notice of ownership of stock, by authorizing them, in their multitudinous details of affairs, to go by their books, in determining the ownership of stock, in paying dividends, so long as they are acting in good faith and with reasonable care, and not hold them, when they come to pay dividends, to an outside knowledge of such ownership, not obtained in due course of business, but based on some interjected or by-way remark as to sale or pledge of stock, let fall in a conversation had with the president at some summer resort, or other place away from his place of business.

This brings us to the right claimed by the Kanawha Valley Bank to determine to which debt or liability it would apply the proceeds of the sale of this stock. In the contract of assignment of this stock which Hearndon gave to the Kanawha Valley Bank, he expressly gave to the bank the right, at the time of collection, to determine such application; and it is easy to see the importance to the bank of such right of application, enabling it to lend without other security, protect itself in case of small overdrafts, and, in general, apply it in support of weak places, wherever and whenever they might occur.   That this right to determine the application of collections or proceeds from the collateral, may be lawfully given the bank holding the collateral

is conceded, but it is contended that the Kanawha Valley Bank may not in this case elect to apply the proceeds of sale (here there have been no collections) to the Russell debt. Hearndon says he understood it was to be used as collateral for money obtained on his own credit without any indorser, and transferred it to defendant W. T. Thompson on 31st May, 1892; but the bank, when notified, on the 9th day of October, 1892, claimed to apply it, as provided in the contract of assignment, to any debt, but agreed that any surplus remaining after being thus applied was to be to the credit of W. T. Thompson. Once, in the presence of the cashier of the Kanawha Valley Bank, Hearndon told the plaintiff, M. W. Donnally, that he had collateral in the bank to protect his indebtedness, including the notes plaintiff had indorsed. The cashier replied that he did have collateral there, but not enough to secure all his indebtedness to the bank; but, in addition, it clearly appears that the Kanawha Valley Bank never had any agreement, except that in the written assignment.

The plaintiff contends that the Kanawha Valley Bank has no right to apply the proceeds of the collateral to the Russell note of two thousand dollars, because it is made to appear, that although in form a note executed by Hearndon to Russell, indorsed by Russell to the bank, which discounted it and placed the proceeds to the credit of Hearndon, which he drew out and used, yet it was used in paying for certain stock bought by Hearndon for himself and Russell, and therefore one thousand dollars (half the note) was in fact, and in that sense, Russell's own debt; and this view seems to be sustained by the evidence, so that in reality, between Hearndon and Russell, the latter is only indorser or surety for the former for one thousand dollars of this note for two thousand dollars. As to the right of the Kanawha Valley Bank to apply the proceeds of the sale of the collateral to the one half of this two thousand dollars, I see nothing to gainsay it effectively, either in the facts or the law of this case. And, if it were necessary to protect the interest of the pledgee, it would also have the right to apply it to the whole note of two thousand dollars; for Hearndon, by his contract of assignment, expressly gave

67

the bank such right of application, no matter what may be the equities between him and Russell. On right of substitution, see *Hawker* v. *Moore*, 40 W. Va. 49 (20 S. E. 848). For nature of pledge and remedies, see 2 Thomp. Corp. §§ 2615 *et seq.*, 2656 *et seq.*

For the reasons given, there should be no decree against the Huntington National Bank for the dividend of two hundred and forty dollars paid to Hearndon, or for the dividend of one thousand dollars properly applied to his debts. The dividend of one hundred and sixty dollars, and the proceeds of the sale of the certificate of stock; after paying costs of suit and expenses of sale, should be applied (1) to balance on the deed of trust debt; (2) to what is called the "Dyer debt"; (3) to the one half of the Russell and Hearndon debt of two thousand dollars; (4) next, to the claim of plaintiff and defendant Champe.

Therefore the decree complained of is reversed, and the cause remanded.